**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

**WILLIAM HALLMAN AND DEANNA WALKER,**    **PLAINTIFFS**
**EACH INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED**

**vs.**            **CASE NO. 3:19-CV-00368-DPM**

**PECO FOODS, INC.**           **DEFENDANT**

**MEMORANDUM IN SUPPORT OF PECO FOODS, INC.'S MOTION TO DECERTIFY
THE CONDITIONALLY CERTIFIED FLSA COLLECTIVE**

   Defendant, Peco Foods, Inc. ("Peco"), has moved to decertify the conditionally certified

collective action under the Fair Labor Standards Act ("FLSA").  In support of its motion, Peco

submits this Memorandum of Law.

## INTRODUCTION

   Plaintiffs, William Hallman ("Hallman") and Deanna Walker ("Walker") (collectively

"Named Plaintiffs" or "Plaintiffs"), are former production workers at Peco's poultry processing

plant in Pocahontas, Arkansas ("Pocahontas Plant"). Plaintiffs contend Peco denied them and

other similarly situated hourly employees overtime compensation in violation of the FLSA

through an alleged policy of requiring hourly workers to "don and doff" clothing and/or personal

protective equipment ("PPE") while "off the clock."  Specifically, Plaintiffs contend they were

not properly compensated for time spent donning PPE pre-shift and/or that they did not receive

bona fide meal breaks due to time spent donning and doffing PPE.

   Pursuant to 29 U.S.C. §216(b), Plaintiffs previously sought the conditional certification

of a collective action consisting of "[a]ll hourly paid workers employed after 17 December

2016." Dkt. No. 8 at ¶3.[1]  Plaintiffs' extraordinarily broad request encompassed hourly workers

at eight (8) separate Peco processing plants located in three (3) states.  Peco opposed the motion.

Dkt. Nos.  8-9, 19-20.

On April 23, 2020, the Court granted Plaintiffs' conditional certification motion "as

significantly modified."  Dkt. No. 22 at 1.  Specifically, the Court "conditionally certifie[d] a

group of hourly paid production workers on the Debone-Conelines at Peco's Pocahontas plant

since 17 December 2016."  *Id.*  Subsequently, 400 current or former workers at the Pocahontas

Plant ("class members") filed consents to participate in the lawsuit during the opt-in period.[2]

Now that discovery has closed, the record demonstrates that for the following reasons the

Court should decertify the FLSA collective and dismiss the claims of the class members:

- The Court will have to conduct a highly individualized analysis of the following liability issues, which renders this matter unfit for adjudication as a collective action:

  - Whether the numerous class members who cannot prove they ever worked on the cone lines are eligible to participate in this collective action.

  - Whether the six minute daily time allowance provided by Peco under-compensated Plaintiffs and the class members for pre-shift donning activities.

  - Whether the two thirty-four minute daily meal breaks provided by Peco to cone lines workers "predominately benefitted" Peco or its workers.

- Plaintiffs cannot produce reliable "representative evidence" to support a liability determination on a collective basis.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016).

## PROCEDURAL BACKGROUND

On April 23, 2020, the Court conditionally certified a FLSA class defined as:

---

[1] Plaintiffs have also asserted claims under the Arkansas Minimum Wage Act ("AMWA").  However, Plaintiffs never moved to certify their claims under the AMWA.
[2] Many of the class members were employed by temporary staffing agencies who assigned them to the Pocahontas Plant.  Peco maintains that it did not employ these workers.

> All hourly paid production workers on the Debone-Conelines at Peco Foods' Pocahontas, Arkansas plant since 17 December 2016.

Dkt. No. 22 at 3. The Court approved notice to all eligible current or former workers at Pocahontas Plant by U.S. mail or text and required Peco to post notice "near the Debone-Conelines." *Id.* To facilitate the provision of notice, Peco provided spreadsheets to Plaintiffs on May 8, 2020 that contained the names of more than 3,000 workers Peco confirmed had worked on the cone lines at the Pocahontas Plant during the relevant time period. Dkt. No. 35.

Subsequently, Peco determined the original spreadsheets it provided Plaintiffs omitted some former workers who may have had a temporary assignment to the cone lines because Peco's payroll system, and the payroll systems used by temporary staffing agencies who supply labor to the Pocahontas Plant, do not capture the frequent temporary re-assignments of workers across the plant based on production needs. *Id.* Accordingly, in order "[t]o ensure all eligible group members receive[d] notice…the parties agreed to provide notice "to all former employees or temporary workers, even though many of them are not eligible to participate in the collective action." *Id.* To mitigate against the potential for ineligible former workers to file consent forms, the parties requested the Court approve a revised consent form that would require the recipient to affirmatively state they had worked on the cone lines at the Pocahontas Plant during the relevant time period and provide an estimate of how many days each year they had worked on the cone lines. *Id.* The Court subsequently approved the supplemental notice and revised consent form and ordered all former workers, who Peco could not confirm had worked on the cone lines during the relevant time period, to file the revised consent form if they were eligible and wished to join the litigation. Dkt. No. 36. Notice was sent out to several thousand additional former workers.

Ultimately, despite notice being sent to thousands of current and former workers, only 400 filed consent forms. Of those, 272 class members filed the original consent form and 137 class members filed the revised consent form (Nine of the class members filed original and revised consent forms). Recently, three class members who filed the original consent form filed a notice of withdrawal of their consent. Dkt. No. 104.

In addition to deposing and propounding written discovery to the Named Plaintiffs, the parties reached a good faith agreement that Peco would (1) obtain merits-based discovery from a limited number of class members and (2) obtain discovery from all class members who filed the revised consent form limited in scope to evaluating their eligibility to participate in the collective action. Plaintiffs propounded written discovery requests to Peco and took a 30(b)(6) deposition of Peco. Discovery closed on August 6, 2021.

## FACTUAL BACKGROUND

### I.    The Pocahontas Plant

The Pocahontas Plant is Peco's newest poultry processing plant. Dkt. No. 19-1 at ¶5. Peco began production at the Pocahontas Plant on May 10, 2016. *Id.* The Pocahontas Plant is a "kill plant" consisting of thirteen separate departments where birds are harvested, processed, packed, and shipped. *Id.* Peco staffs more than 100 different types of hourly positions across the thirteen departments and these positions all have different and unique responsibilities. *Id.* Additionally, there are numerous hourly support positions, such as maintenance, staffed with hourly employees. *Id.*

The "cone lines" are located in the Debone department at the Pocahontas Plant. Exhibit 1 at ¶2.[3] There are a total of ten cone lines on which chicken breasts and tenders are deboned and

---

[3] All exhibits referred to herein are attached to Peco's Motion to Decertify the Conditionally Certified FLSA Collective.

wings are removed.  *Id.*  Workers assigned to the cone lines may be responsible for loading chickens onto inverted cones, making a variety of cuts to each chicken as it moves down the line, pulling tenders or other cuts of meat from the chicken, or x-raying cuts of meat.  *Id.*  In addition to the cone lines, the Debone department consists of a "pack out" area where workers package and/or box poultry products to prepare them for shipment.  *Id.*  There are a total of five supervisors responsible for the cone lines (1 supervisor for every 2 lines) and multiple line leads responsible for assigning specific duties to each of the workers.  *Id.*  The cone lines supervisors report to the Debone Superintendent who is responsible for oversight of the entire Debone department.  *Id.*

For food and/or worker safety reasons, workers assigned to the cone lines are required to wear the following PPE when they are in the production area:  hairnet, beard net(if needed), safety glasses, boots, smock, hearing protection, rubber gloves, and a chain glove if they are performing cuts with a knife or scissors.  *Id.* at ¶3. Safety glasses and boots are issued when the worker begins his/her assignment at Peco and the workers are allowed to take them home each day.  *Id.*  With the exception of the chain glove, the other PPE items are issued each day at the supply window or table located in the employee break room.  *Id.*  The chain glove remains in the production area at all times.  *Id.*

In addition to required PPE, Peco also issues to workers upon their request additional smocks, hairnets, and cotton gloves for their own personal comfort or convenience.  *Id.* at ¶4. Because Peco maintains a cool temperature in the cone lines area for food safety reasons, many workers also choose to bring additional comfort items to don, such as toboggans, sweatshirts, extra socks, and sweatpants.  *Id.*  Peco provides spaces in the breakroom for cone lines workers to don both required PPE and voluntary comfort items.  *Id.*

Peco provides waste bins located immediately outside the production doors for the disposal of items after workers doff their PPE at the end of the shift or when going on break. Peco also provides lockers in the break area for storage of PPE or personal items.  *Id.* at ¶5.

## II.   Peco Compensates Its Workers for Pre-Shift/Post-Shift Donning and Doffing Time.

During the relevant time period, the cone lines operated on two shifts—a day shift and a night shift.  *Id.* at¶6 .  For most of the relevant time period, the day shift started at 7:50 a.m. and the night shift started at 4:50 p.m.  *Id.*  Depending on production needs, the shifts lasted approximately nine (9) hours and employees typically worked four to five days per week.  *Id.* After the end of the night shift, there is a period of time each day where the cone lines are shut down for cleaning and maintenance.  *Id.*

Workers on the cone lines are paid an hourly wage.  *Id.* at ¶7.  Peco begins calculating compensable time from the scheduled start time for the shift.  *Id.*  Workers are required to clock in prior to the beginning of their shift to verify their on-time attendance.  Id.  However, the clock-in time does not factor into the worker's compensable time unless they clock in after the start of the shift. *Id.*  Workers are not required to arrive at the plant at any particular time prior to the start of the shift.  *Id.*

Peco stops calculating compensable time when a worker clocks out following the completion of his/her shift.  *Id.* at¶8.  Since the time clocks are located outside the production area, workers have the opportunity to doff and dispose of and/or store all required PPE, and any additional clothing or gear they choose to wear for personal comfort or convenience, before clocking out.  *Id.*

To ensure Peco compensates for time spent donning and/or doffing required PPE, Peco provides each worker with an allotment of an additional six minutes of compensable time for

each shift (allocated administratively as three minutes at the beginning of the shift and three at the end). *Id.* at ¶9. Since workers are paid until they clock out at the end of the shift, and are allowed to doff all gear prior to clocking out, workers essentially have a six minute daily time allotment to compensate them solely for pre-shift donning. *Id.*

The day and night shifts on the cone lines begin with a supervisor led safety meeting beginning at 7:50 a.m. and 4:50 p.m., respectively. *Id.* at¶10. Most of the line supervisors choose to hold their safety meetings in the break room. *Id.* Supervisors who hold safety meetings in the break room allow workers to don required PPE and personal comfort items during the safety meetings, and in some instances, after the safety meetings conclude. *Id.* Accordingly, Peco provides these workers with at least an additional three to five minutes of paid time to don PPE. *Id.* However, if a supervisor holds his/her safety meeting on the production floor, Peco requires the worker to don all PPE before arriving at the safety meeting. *Id.*

In December 2016, Peco had the validity of its compensation system evaluated through a time and motion study conducted by industrial engineers, Dr. Jeffrey Fernandez and Dr. Anand Subramanian. Dkt. No. 19-1 at ¶7. Dr. Fernandez and Dr. Subramanian utilized the "elemental method" to analyze and measure the time taken with donning and doffing related activities by Peco workers throughout the Pocahontas Plant. Dkt. No. 19-1 at Exhibit A, pg. 4. Their report describes the elemental analysis as follows:

> The elemental analysis breaks down each activity into measurable tasks. One of the major advantages of elemental analyses is that one can isolate delays unrelated to the task under study (i.e., employee stands idle, employee stands in the hallway, employee stands and talks to a coworker, employee sitting idle, etc.) and avoid including them in the total times. *Id.*[4]

---

[4] "'District courts routinely admit expert opinions based on elemental or time study methodology in FLSA cases.'" *Scalia v. East Penn Manufacturing Co., Inc.,* 2020 WL 5409164, *9 (E.D. Pa. Sept. 9, 2020) (quoting *Lugo v. Farmer's Pride Inc.,* 2011 WL 2550376, at *3 (E.D. Pa. June 23, 2011) (collecting cases)).

After studying and analyzing the donning and doffing practices of Peco employees in every position and department at the Pocahontas Plant over the course of two days, Drs. Fernandez's and Subramanian's findings validated the Peco system and confirmed Peco was properly compensating employees for donning and doffing time.  Dkt. No. 19-1 at ¶7; Dkt. No. 19-1 at Exhibit A.  With regard to the pre-shift/post-shift activities of the cone lines workers, these experts measured the total donning, doffing, walking, and washing time to be 4.419 minutes, which is well below the six minute time allowance provided by Peco.  Dkt. No. 19-1 at Exhibit A, pg. 9.

In May 2021, Dr. Subramanian returned to the Pocahontas Plant for a follow-up time and motion study focused on the cone lines.  Exhibit 6.   Dr. Subramanian and his team observed and videoed the donning and doffing related activities of the cone lines workers for two days.  *Id.* at 2.  After learning that the time workers spend walking to and from their line, washing, and doffing at the end of the shift are performed "on the clock," Dr. Subramanian did not include those measurements in the start of shift/end of shift analysis since it is undisputed that those activities are fully paid.  *Id.* at 7.  After making this adjustment, Dr. Subramanian's measurement for pre-shift/post-shift activities decreased to a median of 1.834 minutes.  *Id.* at  8.

Peco has designated Dr. Subramanian as a testifying expert in this matter.  Based on both the 2016 and 2021 studies, it is Dr. Subramanian's opinion that Peco's compensation system more than adequately compensates its workers for pre-shift and post-shift donning and doffing related activities.  *Id.* at 10.

### III.    Peco Provides The Workers On The Cone Lines With Two Bona Fide Meal Breaks Per Shift.

Peco provides the workers on the cone lines with two thirty-four minute meal breaks per shift.  Exhibit 1 at ¶11.  For each break, Peco's timekeeping software automatically deducts

thirty minutes from the worker's compensable time. *Id.* The remaining four minutes of the break are paid. *Id.* The additional four minutes of paid break time is intended to compensate the workers for time spent doffing PPE at the beginning of the break and time spent donning PPE at the end of the break. *Id.* To ensure the employees are provided with at least a four minute allowance for donning and doffing, the "lead" on each shift, who is also an hourly employee, records the actual time spent on break by using a manual time clock to punch a card at the beginning and end of each break. *Id.*; Dkt. No. 19-2 at Exhibit A.

With the exception of the brief periods of time spent at the beginning and the end of the breaks on donning and doffing activities, Peco relieves workers from performing any work duties during their breaks. Exhibit 1 at ¶12. Peco provides the workers with a break room equipped with tables for dining, microwaves for preparing food, and fully stocked drink and vending machines. *Id.* Workers are free to go to their vehicles during the break and even leave the site if they choose to purchase food or run errands. *Id.* In depositions, class members have consistently testified that during breaks, they are able to prepare food, eat, use the restroom, make calls, smoke, sit in their vehicles, leave the site to purchase food, and/or utilize the hand-waxing station to warm their hands.[5]

## ARGUMENT AND AUTHORITIES

### I.     The Legal Standard

Section 216(b) of the FLSA provides that an action for unpaid overtime may be maintained against an employer by "any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. §216(b). Section 216(b)'s

---

[5] Peco is filing a motion for partial summary judgment on Plaintiffs meal break claims, which will be supported by deposition testimony from Plaintiffs and class members concerning their activities during break. Peco incorporates herein by reference the deposition exhibits submitted with Peco's motion for partial summary judgment on Plaintiffs' meal break claims.

collective action mechanism "sets forth two requirements for the adjudication of claims as collective actions: (1) the plaintiffs must be 'similarly situated' and (2) all party plaintiffs must give their written affirmative consent to participate in the action. *Wright v. Pulaski County*, 2010 WL 3328015, \*9 (E.D. Ark. Aug. 24, 2010). "[T]he fundamental inquiry in determining whether a collective action under §216(b) is appropriate is whether or not the plaintiffs are 'similarly situated.'" *Smith v. Heartland Auto Servs., Inc.,* 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005).

District courts in the Eighth Circuit determine whether collective certification under § 216(b) of the FLSA is appropriate in two stages: the Court considers plaintiffs' initial motion for conditional certification followed by, if necessary, a subsequent motion by defendant for decertification after a more complete record is established. *Harris v. Southwest Power Pool, Inc*., 2011 WL 5402763, \*1 (E.D. Ark. Nov. 8, 2011); *Pressler v. FTS USA, LLC*, 2010 WL 1904974, \*3 (E.D. Ark. May 12, 2010); *Resendiz-Ramirez v. P&H Forestry, LLC*, 515 F. Supp. 2d 937 (W.D. Ark. 2007). At the decertification stage, Plaintiffs bear the burden of proving that they and the putative class members are in fact similarly situated. *King v. West Corp,* 2006 WL 118577, \*13 (D. Neb. Jan. 13, 2006). "[A] stricter standard of proof is applied at the second step in deciding whether opt-in plaintiffs are 'similarly situated…'" *Id. See Freeman v. Wal-Mart Stores, Inc.,* 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003). "To avoid decertification, the named plaintiffs must introduce substantial evidence that the opt-in plaintiffs are similarly situated." *White v. Baptist Mem. Health Care Corp.,* 2011 WL 1883959, \*4 (W.D. Tenn. May 17, 2011) (citations omitted).

In analyzing the similarly situated requirement at this stage, courts consider (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual as to each plaintiff; and (3) fairness and

procedural considerations that would make certification improper. *Wright,* 2010 WL 3328015, at *9 (citing *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1103 (10th Cir. 2001)). "[T]he similarities necessary to maintain a collective action under §216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Anderson v. Cagle's, Inc.,* 488 F.3d 945, 953 (11th Cir. 2007) (citations omitted). The guiding consideration in analyzing these factors is "whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected." *Douglas v. First Student, Inc.,* 888 F. Supp. 2d. 929, 933 (E.D. Ark. 2012).

A collective action can only survive a motion to decertify where "multiple claims can be adjudicated efficiently because they share common underlying facts and do not require substantial individualized determinations for each class member." *Purdham v. Fairfax Cnty. Pub. Schs.,* 629 F. Supp. 2d 544, 547 (E.D. Va. 2009). If liability is "a mainly individual inquiry, then class treatment of this action is not efficient in any way." *Holaway v. Stratasys, Inc.,* 2013 WL 578476, *2 (D. Minn. Oct. 28, 2013). Individualized liability determinations "weigh heavily in favor of decertification." *Id.*

## II. The Court Should Decertify the Collective Action Because the Court Will Have to Conduct Highly Individualized Analyses of Multiple Liability Issues Rendering This Matter Unfit for Adjudication as a Collective Action.

### A. There are Disputed Issues of Fact Regarding Whether Numerous Class Members are Eligible to Participate in the Collective Action.

An opt-in plaintiff who fails to meet the court ordered requirements to opt into an FLSA collective action should be dismissed. *Cottle v. Falcon Holdings Management, LLC*, 892 F. Supp. 2d 1053, 1073-74 (N.D. Ind. 2012) (granting defendant summary judgment on the claims of five opt-ins "who do not meet the criteria for participation in the collective action…"); *Myers v. Crouse Health System, Inc.,* 274 F.R.D. 404, 410-12 (N.D.N.Y. 2011) (dismissing claims of

seven opt-ins who did not "meet the requirements to opt-in."). Here, this Court limited the eligibility to participate in the collective action to workers who had been assigned to the cone lines at the Pocahontas Plant at some point since December 17, 2016. Dkt. No. 22. As discussed *supra*, Peco does not document every time a worker is temporarily assigned to the cone lines, or any other area in its facility, to meet a need. Therefore, where there was no documentation as to whether potentially eligible current or former workers had been assigned to the cone lines during the relevant time period, the workers were required, if they desired to join this litigation, to file a revised consent form affirmatively stating they had worked on the cone lines and estimating how many days they had worked on the cone lines during each year. The purpose of the revised consent form was to prevent ineligible workers from joining the litigation.

137 class members filed the revised consent form. In discovery, a significant number of these class members admitted that they never worked on the cone lines. *See*, e.g., Exhibits 23-27 at Response to Interrogatory No. 1. It appears many of them were either confused by the revised consent form or signed and submitted the form without reading or filling it out. Peco is moving for summary judgment on the claims of these class members.

In addition to the class members that have admitted to having never worked on the cone lines, there are over thirty additional class members who claim they worked on the cone lines, but have provided descriptions of their job duties and responsibilities that do not match with the duties and responsibilities of any of the positions on the cone lines. *See*, e.g., Exhibits 28-32. As a threshold matter, this Court will have to conduct a very individualized analysis to determine whether these class members satisfy the criteria for participation in the collective action. Individualized liability determinations "weigh heavily in favor of decertification." *Holaway*, 2013 WL 578476 at *2. *See also In re Zurn Pex Plumbing Prods. Liab. Litig.,* 644 F.3d 604, 616

(8th Cir. 2005) ("A district court may not certify a class…if it contains members who lack standing."); *Blades v. Monsanto Co.,* 400 F.3d 562, 571 (8th Cir. 2005) (when "not every member of the proposed classes can prove with common evidence that they suffered impact from the alleged conspiracy…damages to all class members must be shown to justify the class action").   Accordingly, for this reason alone, the Court should decertify the collective action and dismiss the claims of the opt-ins.

> **B.     The Liability Determination for Each Class Member's Pre-Shift Donning Claim Turns on Individualized Evidence as to Whether They Were Under-Compensated for Their Donning Activities.**

A determination of Peco's liability under the FLSA on Plaintiffs' pre-shift donning claims will require highly individualized inquiries as to each class member's pre-shift donning activities every day of every week.   Throughout the relevant time period, Peco has paid all workers on the cone lines at the Pocahontas Plant an allowance of at least six minutes per shift to compensate them for donning PPE.   Therefore, it is undisputed Peco's policy and practice is lawful to the extent it takes its workers six minutes or less to don their PPE.

As a result, in order to evaluate potential liability under the FLSA for any particular week, the Court necessarily would have to conduct individualized inquiries into each class member's donning activities to determine if they took more than six minutes to don PPE. Whether a class member spent 5:59 or 6:01 engaging in pre-shift donning activities is relevant to whether there could be any liability on their claim.[6]   Thus, each class member's case will require

---

[6] Plaintiffs have filed a motion for partial summary judgment asking this Court to rule as a matter of law that the FLSA requires Peco to compensate its workers for the "actual time" spent donning and doffing PPE each day.  Dkt. No. 107.  Peco opposes this motion and takes the position that the FLSA allows it to compensate Plaintiffs based upon a reasonable estimate of the time needed to don and/or doff the required PPE.  Assuming *arguendo* that Plaintiffs are correct on this legal issue, the Court will have to conduct an individualized analysis of whether the actual time each Plaintiff spent donning PPE on a daily basis exceeded Peco's six minute time allowance to determine whether there is potential liability for uncompensated overtime under the FLSA.

the Court to consider different background facts and different testimony based on each class member's activities during the relevant time period.

As noted previously, one factor courts consider in determining whether to decertify a conditionally-certified FLSA class is defenses available to the defendant which appear to be individual as to each plaintiff. *See Wright*, 2010 WL 3328015 at *9. Where there are class members that have no liability, Defendant's individualized defenses to liability call for decertification. *See Camesi v. Univ. Pittsburgh Med. Ctr.,* 2011 WL 6372873, *9 (W.D. Penn. Dec. 20, 2011) (citing *Wright*, 2010 WL 3328015 at *10). In *Douglas v. First Student, Inc.,* 888 F. Supp. 2d 929, 935-36 (E.D. Ark. 2012), the court decertified where "one Opt-in plaintiff testified he was paid for all the hours he worked…As to these individuals, First Student has no liability under the FLSA in light of their testimony in this case" Citing *Camesi,* 2011 WL 6372873, at *9 (decertifying the conditionally-certified FLSA class in light of defendant's individualized defenses which included "whether individual plaintiffs worked overtime without compensation.").

Courts routinely hold that collective treatment under § 216(b) is inappropriate when individualized inquiries would be necessary in order to establish liability as to each class member. As the court in *Gatewood v. Koch Foods of Miss., LLC* explained:

> [T]his collective action would be unmanageable because 'this case is fraught with questions requiring distinct proof as to individual plaintiffs.' *Bayles v. Am. Med. Response of Colo., Inc.,* 950 F. Supp. at 1067. 'Indeed, a collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability.' *Id; see also Lusardi,* 122 F.R.D. at 466 (sheer number of witnesses that would be required to prove individual issues unmanageable). As the *Thiessen* court observed, '[t]here is simply a realistic limit on what a jury may reasonably be expected to absorb, retain and process.' *Thiessen*, 966 F. Supp at 1084; *see also Smith v. Brown & Williamson Tobacco Corp.,* 174 F.R.D. at 98 ('[N]either party can seriously expect a jury's full

attention and consideration for the length of such [class action] proceedings, nor can they expect evenhanded, consistent treatment from beginning to end.').

2009 WL 8642001, *20 (S.D. Miss. Oct. 20, 2009).

The decision in *Lugo v. Farmer's Pride, Inc.,* 737 F. Supp. 2d 291 (E.D. Pa. 2010), which involved analogous factual circumstances, is instructive.  In *Lugo*, plaintiffs worked at a poultry processing plant.  *Id.* at 295.  Plaintiffs were compensated on a line time basis and were paid a pre-determined allowance to compensate for time spent donning and doffing PPE.  *Id.*  The court conditionally certified a collective action, in part, based on plaintiffs' assertion that the allowances under-compensated plaintiffs for donning and doffing time.  *Id.* at 292-93.  In moving to decertify the collective action, defendant noted that "schedules under which plaintiffs were compensated provide[d] different amounts of paid time for donning and doffing activities" based on departments, shift, and scheduling revisions over time.  *Id.* at 301-02.

In granting defendant's motion, the court explained that although the evidence indicated that some hourly workers might have legitimate claims of under-compensation, it also indicated that some might not.  *Id.* at 303.  Accordingly, the evidence failed to demonstrate "that the question of undercompensation [could] be answered in [a] manner common to all plaintiffs."  *Id.*  In reaching this decision, the court distinguished the case from those where "the only material difference among plaintiffs is the amount of damages owed to each of them."  *Id. See also Fox v. Tyson Foods, Inc.,* 2006 WL 6012784, *5-*6 (N.D. Ala. Nov. 15, 2006) (refusing to certify collective action involving donning and doffing claims by employees at multiple poultry processing plants because of the lack of uniform policy and because the claims could not be adjudicated "without individualized determinations").

03959764                                          15

Here, there are multiple material differences in the claims of the various class members. The claims require the Court to conduct an individualized analysis of their contention that Peco's compensation policy and practices under-compensated them for pre-shift donning time.

First, an unknown number of class members worked on lines with supervisors who allowed them to don their PPE after the start of the shift during paid safety meetings. This is supported by testimony from Peco's Director Human Resources, the observations of Dr. Subramanian, and from the testimony of class members who not only testified upon personal experience but also about witnessing other employees on their shift donning PPE during the paid safety meetings. Exhibit 1 at ¶10; Exhibit 6 at 9. *See,* e.g., Exhibit 33 at 18-19; Exhibit 34 at 35-38. These class members were allowed to don their PPE on paid time in addition to receiving the six minute time allowance all workers received.

Second, multiple class members have testified that they were routinely late to work and that they were allowed to don their PPE after the shift started and the paid safety meeting had ended. *See,* e.g., Exhibit 6 at 9; Exhibit 34 at 35-38; Exhibit 35 at 49-51. Some of these class members utilized the bus transportation Peco and/or the staffing agencies provided to and from the Pocahontas Plant and contend the buses did not arrive early enough for them to be ready by the start of the shift. Exhibit 35 at 49-51. Others simply did not get to work on time. Either way, they were allowed to don their PPE while on paid time in addition to receiving the six minute time allowance all workers received.

Finally, the time estimates the Plaintiffs and class members have provided in discovery for donning PPE have varied greatly. There are class members who admit they don their PPE within six minutes or a slightly greater period of time that would clearly qualify as *de minimis*. *See*, e.g., Exhibit 2 at Response to Interr. No. 11 (Named Plaintiff Hallman, admits both donning

and doffing took a total of seven minutes, which since his doffing time was fully paid on the clock, establishes he fully paid for all pre/post shift donning and doffing time);  Exhibit 7 at 20-22, 39 (donning PPE took one to two minutes);  Exhibit 8 at 42-43 (able to don, doff, go to restroom, and walk to and from production line within five minutes on unscheduled breaks);  Exhibit 9 at Response to Interr. No. 11 (donning and doffing took a total of three minutes);  Exhibit 10 at Response to Interr. No. 11 (donning and doffing took a total of five minutes);  Exhibit 11 at Response to Interr. No. 11 (donning and doffing took a total of five to seven minutes);  Exhibits 12-17 at Response to Interr. No. 11 (donning and doffing took a total of five to 10 minutes); Exhibit 34 at 41-42 (able to don within five to 10 minutes despite either socializing or listening to safety meeting while donning).  *See Lyons v. Conagra Foods Packaged Foods, LLC*, 899 F.3d 567, 584 (8th Cir. 2018) (noting that "'[m]ost courts have found daily periods of approximately ten minutes *de minimis* even though otherwise compensable.'").  To the contrary, there are other class members who contend it takes as much as fifteen to thirty minutes to don and doff their PPE.  See, e.g., Exhibits 18-22 at Response to Interr. No. 11.

The significant differences in these time estimates for donning and/or doffing identical PPE could be related to a number of factors within the worker's control, such as donning, in addition to the required PPE, optional sanitary or clothing items for comfort( e.g., extra smocks, multiple cotton gloves, sweatshirts and sweatpants) and socializing with other workers while donning.   Exhibit 1 at ¶4; Exhibit 6 at 9; Exhibit 35 at 35-37, 45-48.  These individualized factors directly impact liability and the Court should allow Peco to cross-examine each class member concerning their donning routines.

Accordingly, because of the numerous individualized inquiries that will be required to evaluate Plaintiffs' claims regarding alleged under-compensation for pre-shift donning, and to

evaluate Peco's defenses to these claims, such as the *de minimis* time defense, the Court should decertify the collective action and dismiss the claims of the class members.

### C. The Liability Determination For Each Class Member's Meal Break Claim Turns On Individualized Evidence As To Whether Each Break Predominantly Benefits Peco or The Worker.

Peco is filing a motion for partial summary judgment on Plaintiffs' meal break claims. However, assuming *arguendo* that this Court finds material issues of disputed fact that preclude summary judgment, in whole or in part, the individualized inquiries as to the merits of each class member's meal break claim warrants decertification of the collective action.

In the Eighth Circuit, the "predominant benefit" test applies when the Court analyzes the compensability of meal period donning and doffing, and related activities. *Henson v. Pulaski Co. Sheriff Dep't*, 6 F.3d 531, 534 (8th Cir. 1993), reaffirmed in *Lopez v. Tyson Foods, Inc.,* 690 F.3d 869 (8th Cir. 2012). Under the predominant benefit test, the meal period *as a whole* is examined to determine whether it is for the "predominant benefit of the employer or the employees. *Id.* The predominant benefit test denies compensability if the employees receive the predominant benefit of their meal periods. District courts have repeatedly applied the predominant benefit standard to determine whether employees are entitled to be paid for breaks which include donning and doffing time. *See Guyton v. Tyson Foods, Inc.,* 2012 WL 13055460, *5 (S.D. Iowa April 3, 2012); *Lugo v. Farmer's Pride,* 802 F. Supp. 2d 598, 613 (E.D. Pa. 2011); *Garcia v. Tyson Foods, Inc.,* 766 F. Supp. 2d 1167, 1180-82 (D. Kan. 2011).

Peco's motion for partial summary judgment on Plaintiffs' meal break claims and supporting memorandum fully set forth the numerous facts establishing that Plaintiffs and the class members received the predominant benefit of the two thirty-four minute breaks they

received each shift.  Peco incorporates the aforementioned motion, memorandum, and supporting exhibits herein by reference.

Based on Peco's motion for partial summary judgment, the Court should dismiss Plaintiffs' meal break claims in their entirety, with prejudice.  However, if this Court determines there are disputed issues of fact preventing summary judgment, in whole or part, the Court will be required to conduct individualized inquiries into the manner in which each class member utilizes his/her break to determine whether each class member enjoys the predominant benefit of the break.  These individualized inquiries would render Plaintiffs' meal break claims unfit for adjudication in a collective action.  Accordingly, for this additional reason, the Court should decertify the collective action and dismiss the claims of the class members.

### III.    The Court Should Decertify the Collective Action Because Plaintiffs Cannot Produce Reliable "Representative Evidence" to Support a Liability Determination On a Collective Basis.

"Plaintiffs may be similarly situated when 'they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.'"  *Bouaphakeo v. Tyson Foods, Inc.,* 765 F.3d 791, 796 (8th Cir. 2014) (quoting *O'Brien v. Ed Donnelly Enters., Inc.,* 575 F.3d 567, 585 (6th Cir. 2009)). Plaintiffs intend to use "representative evidence" consisting of anecdotal testimony from an unkown number of class members to attempt to meet this burden. Exhibit 2 at Response to Interrogatory No. 4.  The United States Supreme Court's decision in *Tyson v. Bouaphakeo*, 136 S. Ct. 1036 (2016) provides helpful guidance on the use of representative evidence in an FLSA collective action.  Based on the Court's decision in *Tyson*, and subsequent case law applying *Tyson*, Plaintiffs' anecdotal testimony in this case would not constitute sufficiently reliable representative evidence to support a determination of liability on a class basis.

In *Tyson*, plaintiffs challenged Tyson's compensation policy for donning and doffing at a pork processing plant in Iowa where Tyson "compensated some employees for between four and eight minutes [for donning and doffing time] but paid others nothing beyond their gang-time wages. *Tyson*, 136 S. Ct. at 1042. The district court certified a FLSA collective action as well as a class action under Fed. R. Civ. P. 23. *Id.* The case proceeded to a jury trial. *Id.* at 1043.

At trial, plaintiffs introduced "'representative evidence'" from "industrial relations expert, Dr. Kenneth Mericle." *Id.* "Mericle conducted 744 videotaped observations and analyzed how long various donning and doffing activities took." *Id.* He then opined that the 744 workers he observed averaged "18 minutes a day for the cut and retrim departments and 21.25 minutes for the kill department." *Id.* Plaintiffs then produced testimony from a second expert who took the average donning and doffing times calculated by Dr. Mericle, and each individual class member's time records, to develop an opinion as to whether and to what extent Tyson's system had resulted in each class member being under-compensated for overtime wages. *Id.* at 1044. The jury returned a verdict, in part, for plaintiffs and a divided Eighth Circuit affirmed on appeal. *Id.*

> The U.S. Supreme Court granted certiorari, in part, to consider the following issue:
>
> Whether differences among individual class members may be ignored and a class action certified under Federal Rule of Civil Procedure 23(b)(3), or a collective action certified under the Fair Labor Standards Act, where liability and damages will be determined with statistical techniques and presume all class members are identical to the average observed sample.

*Tyson*, 2014 U.S. Briefs 1146, i.; *Tyson Foods, Inc. v. Bouaphakeo*, 135 S. Ct. 2806 (2015).

In addressing this issue, the Court reasoned that "[a] representative or statistical sample, like all evidence, is a means to establish or defend against liability. Its permissibility turns not on the form of the proceeding—be it a class or individual action—but on the degree to which the

evidence is reliable in proving or disproving the relevant causes of action." *Id.* at 1046. "One way for [plaintiffs] to show…that the sample relied upon…is a permissible method of proving classwide liability is by showing that each class member could have relied on the sample to establish liability if he or she had brought an individual action. If the sample could have sustained a reasonable jury finding as to hours worked in each employee's individual action, that sample is a permissible means of establishing the employees' hours worked in a class action." *Id.* at 1046-47.

However, the Court made it clear that not all representative evidence is sufficient to support a collective action stating "that not all inferences drawn from representative evidence in an FLSA case are 'just and reasonable'". *Id.* at 1048 (citing *Mt. Clemens*, 328 U.S. at 687). The Court explained that "[r]epresentative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked." *Id.* at 1048-49. The Court ultimately held that based on the record before it, plaintiffs' representative evidence had met this standard where Tyson "did not raise a challenge to respondents' experts' methodology under *Daubert*; and as a result, there is no basis in the record to conclude it was legal error to admit that evidence. *Id.* at 1049.

In a factually analogous post-*Tyson* case, the United States District Court for the Western District of Arkansas addressed whether plaintiffs could maintain a collective action where, like Plaintiffs in this case, they did not conduct a scientifically valid time and motion study, but instead, proposed to rely upon representative evidence consisting of anecdotal "testimonial evidence from unknown opt-in plaintiffs who were not randomly chosen." *Melgar v. OK Foods*, Case No. 2:13-CV-02169 at 5 (W.D. Ark. April 29 2016), attached to motion as Exhibit 36. In *Melgar*, plaintiffs alleged defendant's compensation system at its poultry processing plant for

pre-and post-shift donning and doffing, which consisted paying a set time allowance of eight minutes per shift, violated the FLSA because it under-compensated plaintiffs.  *Id.* at 1-2. Plaintiffs also alleged the two unpaid breaks per shift were not bona fide meal breaks.  *Id.*  The court conditionally certified a collective action under the FLSA.  *Id.* at 2.  After defendant moved to decertify, the court stayed the case pending the United States Supreme Court's decision in *Tyson.  Id.*

Relying on *Tyson*, the court held that decertification was warranted where "[t]he representative evidence Plaintiffs intend to rely on has not been shown to be statistically adequate or otherwise reliable such that it would be admissible in an individual action or support a just and reasonable inference as to the amount of time each plaintiff spent donning and doffing protective gear."  *Id.* at 6.  The court noted that "Plaintiffs have not conducted a time study or retained an expert—the kind of evidence that the Supreme Court found to be crucial in the maintenance of the *Tyson Foods* action."  *Id.*  The court also noted that due to dissimilarities in the various class members claims, plaintiffs had "not shown that any one of them could rely on the testimony of the others to demonstrate liability in his own case."  *Id.*

In addition to concerns about the reliability of plaintiffs' representative evidence, the court found that it would be "unfair to Defendants to be expected to collectively defend against the claims of [numerous plaintiffs] by seeking to discredit the unknown number of hand-picked representatives Plaintiffs choose to call to testify."  *Id.*  Additionally, the court held that it would be "procedurally unwieldy" to conduct a trial as proposed by plaintiffs where both sides would be allowed to call potentially hundreds of witnesses.  *Id.*

This case is just like *Melgar.*  Plaintiffs have not conducted a time study, or designated any sort of expert, and discovery has now closed.  The only time studies that have been

conducted in this case establish that Peco's compensation system more than adequately compensates its workers for donning and doffing time.  There is no documentation of the amount of time each individual plaintiff spends daily on donning and doffing, and Plaintiffs, like the plaintiffs in *Melgar*, intend to attempt to fill this evidentiary gap with anecdotal testimony from an unknown number of class members they hope to extrapolate to the entire class.  However, Plaintiffs have not, and indeed cannot, establish that the representative evidence they intend to rely upon is "statistically adequate or otherwise reliable such that it would be admissible in an individual action or support a just and reasonable inference as to the amount of time each plaintiff spent donning and doffing protective gear."  *Id.*

Plaintiffs submitted affidavits from Named Plaintiff, Hallman and opt-in, Joshua Kelson ("Kelson") to support their motion for conditional certification.  Dkt. No. 8-7-8.  Discovery has revealed the testimony from these two witnesses cannot support this collective action.  Named Plaintiff, Hallman never worked on the cone lines during the relevant time period.  Exhibit 4 at 29-41.  After refusing to submit to a deposition, Kelson withdrew his consent to participate in this litigation.  Dkt. No. 104.  Likewise, Named Plaintiff, Walker only worked at the Pocahontas Plant for a total of seventeen days, and with the exception of a couple of days where she was transferred to fill-in in the Debone department mid-shift, she spent all of her time in the Further Processing/Breading department. Exhibit 5 at 70-80.   With regard to the remainder of the class, as discussed *supra*, the differences among the class members are so numerous and significant that it would be impossible for Plaintiffs to cobble together a representative group that could provide reliable testimony the Court could extrapolate to the entire class in order to determine liability in a reliable manner.

Plaintiffs' inability to produce "statistically adequate or otherwise reliable…" representative evidence creates significant concerns with regard to "fairness and procedural considerations…"  *Melgar*, 2:13-CV-02169-PKH at 4, 6.   It would be unfair to require Peco to defend against the claims of this entire class "by seeking to discredit the unknown number of hand-picked representatives Plaintiffs choose to call to testify."  *Id.* at 6.  Additionally, a trial at which scores of witnesses would be called to testify by both sides would be "procedurally unwieldy."

Accordingly, because Plaintiffs cannot establish  the representative evidence they intend to rely upon is "statistically adequate or otherwise reliable such that it would be admissible in an individual action or support a just and reasonable inference as to the amount of time each plaintiff spent donning and doffing protective gear," the Court should decertify the collective action and dismiss the claims of the class members.

## CONCLUSION

There are significant differences in the individual claims of the Named Plaintiffs and 397 class members that will require an individualized analysis of each person's FLSA claim to determine if there is liability.  Likewise, Peco has multiple defenses to the claims of the class members, such as the *de minimis* time defense, that will require an individualized analysis to determine their applicability to each class member.  In addition to the individualized analyses that render this case unfit for collective adjudication, Plaintiffs have wholly failed to provide reliable representative evidence that would provide an adequate basis for a determination of liability on a collective basis.  Plaintiffs did not conduct a time study to develop reliable statistical evidence and have nothing more to support their claims than anecdotal testimony from

class members who are not similarly situated.  Therefore, the Court should decertify the FLSA class and dismiss the claims of the class members.

Dated:  September 7, 2021.

Respectfully submitted,

**PECO FOODS, INC.**

By: /s/ *Scott F. Singley*

OF COUNSEL:
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
STEVEN J. CARMODY, AR Bar No. 2013011
SCOTT F. SINGLEY, MS Bar No. 100134 (ADMITTED PRO HAC VICE)
KAREN E. HOWELL, MS Bar No. 102243 (ADMITTED PRO HAC VICE)
P.O. Drawer 119
Jackson, MS 39205-0119
Telephone: (601) 948-3101
scarmody@brunini.com
ssingley@brunini.com
khowell@brunini.com

Mike S. Moore, AR Bar No. 82112
FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue
Little Rock, Arkansas   72201-3522
Telephone:  501-370-1526
Facsimile:   501-244-5348
mmoore@fridayfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing document via the Court's ECF System, which caused to be served a copy on all counsel and parties of record.

Dated:  September 7, 2021.

/s/ *Scott F. Singley*
Scott F. Singley